IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JD & Associates, Ltd., | ) | |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT AND** |
| vs. | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| | ) | Case No. 3:04-cv-59 |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## FINDINGS OF FACT

### Background

1.  The current action concerns employment taxes, with concomitant interest and penalties, assessed against JD & Associates, Inc. (hereafter "JDA") on the salary it paid to Jeffrey Dahl, its sole shareholder, officer, and director, for twelve quarters.

2.  On May 11th, 2004, JDA brought this action seeking a refund of $2,861.44 which it paid during the first quarter of 1997 (doc. #1).

3. The United States filed an answer and counterclaim on July 29, 2004, wherein it resisted Plaintiff's suit and further sought $22,385.92 for additional tax assessments (doc. #5).  The assessments were based on the theory that JDA paid unreasonably low wages to Dahl while simultaneously paying out large dividends to its sole shareholder, who was Dahl.  These figures were derived from all quarters from 1997 through 1999, excepting the first quarter of 1997 which had already been paid.  They are broken down as follows:

| Period | Additional FICA witholding tax | Failure to deposit penalty | Assessed interest |
|---|---|---|---|
| Second quarter 1997 | $1,637.72 | $163.77 | $785.93 |
| Third quarter 1997 | $1,637.72 | $163.79 | $730.95 |
| Fourth quarter 1997 | $1,637.72 | $163.77 | $678.24 |
| First quarter 1998 | $1,287.95 | $128.80 | $495.33 |
| Second quarter 1998 | $1,287.95 | $128.80 | $459.73 |
| Third quarter 1998 | $1,287.95 | $128.80 | $424.83 |
| Fourth quarter 1998 | $1,287.95 | $128.80 | $392.07 |
| First quarter 1999 | $1,360.94 | $136.09 | $392.04 |
| Second quarter 1999 | $1,361.08 | $136.11 | $357.07 |
| Third quarter 1999 | $1,360.94 | $136.09 | $320.60 |
| Fourth quarter 1999 | $1,361.08 | $136.11 | $289.20 |

4.  The additional assessments are based on an IRS audit that concluded that a reasonable salary for Dahl would be substantially higher than the ones submitted to the IRS.  The additional taxation is based on the following assessment:

| Year | Amount reported as compensation | IRS determination of fair compensation | Additional amount subject to tax |
|---|---|---|---|
| 1997 | $19,000 | $61,817 | $42,817 |
| 1998 | $30,000 | $63,672 | $33,072 |
| 1999 | $30,000 | $65,582 | $35,582 |

5. Dahl exhausted his administrative remedies with the Internal Revenue Service before initiating litigation.

### Dahl and JD & Associates, Ltd.

6.  Jeffrey Dahl is an accountant in Fargo, ND and the principal of JDA.

7.  Dahl is 44 years old.  He was born and raised on a farm near Felton, Minnesota and graduated from high school in Glydon, Minnesota.

2

8.  Dahl attended Mayville State University and Moorhead State University (now Minnesota State University, Moorhead) and received a college degree from the latter in the subject of accounting.

9.  Dahl is a Certified Public Accountant (CPA).  After graduation, he worked for Ernst & Young in Minneapolis, then later Charles Bailly in Fargo, and Aerial Contractors in Fargo.  At Ernst & Young and Charles Bailly, Dahl was an auditor.  While at Aerial Contractors, Dahl provided services as a bookkeeper and prepared financial statements.

10.  Dahl began preparing tax returns for others as a volunteer while in college.  He began preparing them professionally in 1990 for the 1989 tax year.

11.  JDA is an accounting firm formed by Dahl in 1993.  It is located in Fargo, ND.

12.  JDA is registered as a subchapter S corporation for federal tax purposes.   S corporations are referred to as passthrough entities because the items of income and expense are not taxed at the corporate level, but are passed through to each shareholder in his or her pro rata share. The individual shareholder then reports the income and expenses on his or her individual tax return.

13.  Dahl is the sole owner of JDA.

14.  JDA's net worth does not exceed $2 million.

15.  JDA performs tax services, bookkeeping, and review of financial statements for its customers.  Roughly 40% of its services are tax-related.

16.  Other than Dahl, JDA had two employees in 1997 and three employees in 1998 and 1999.

17.  Dahl has been the sole shareholder, officer, and director of JDA since its inception.  He serves as JDA's president, vice-president, secretary, and treasurer.

18.  At JDA, Dahl prepares tax returns, performs bookkeeping services, and reviews

3

financial statements and related fieldwork.

19.  Dahl is responsible for all of JDA's personnel hiring and retention decisions.

20.  Dahl pays all of JDA's bills, and is the only person authorized to write checks for JDA.

21.  Dahl maintains the books and records of JDA, including financial books, corporate minutes, and tax returns.

22.  Dahl is responsible for the overall management responsibilities at JDA, including the assignment of work to other employees.

23.  Dahl performs the majority of review of other employee's work.

24.  Dahl is responsible for JDA's marketing.

25.  From 1996 to 1999, JDA saw a steady increase in the amount it billed its customers.  In 1996, JDA billed $9,000 more than the previous year, in 1997 JDA billed $53,830 more than it did in 1996, in 1998 JDA billed $8,000 more than 1997, and in 1999, JDA billed $41,000 more than it did in 1998.

26.  The gross receipts for JDA during the 1997 year were $182,158, with an ordinary income of $76,221, the gross receipts for 1998 were $232,721, with an ordinary income of $83,667, and the gross receipts for 1999 were $235,830, with an ordinary income of $77,320.

27.  Dahl's annual salary for 1997 was $19,000, $30,000 for 1998, and $30,000 for 1999.

28.  The compensation in 1997 for one JDA employee was $22,091, the compensation for the other JDA employee was $21,332.  Neither employee was identified during testimony.  In 1998, Employee Linda Meyer earned $23,266, Jason Luther earned $20,738, and Doreen Filler worked part of the year for $10,847 (a prorated amount of $22,000).  In 1999, Linda Meyer earned $27,448, Jason Luther earned $24,614, and Doreen Filler was paid $25,313.

29.  JDA paid dividends to Dahl as its sole shareholder at the end of each year.  The

dividends were tied to the profitability of JDA and not to any work performed by Dahl.

30.  In January 1998, JDA authorized a dividend from 1997's earnings that totaled $94 per share, for a total of $47,000 paid to Dahl.  In January 1999, JDA authorized a dividend from 1998's earnings that equaled $100 a share, for a total of $50,000 paid to Dahl.  In January 2000, JDA approved a dividend payment of $100 a share, for a total of $50,000 paid to Dahl.

31.  Rather than being paid as a lump sum, these payments received the amount as advances throughout the year.  Dahl then offset these advances against the dividend once announced.

32.  Dahl considered these advances as one factor in determining the size of the yearly dividend JDA paid to him.

33.  The United States offered expert testimony on whether Dahl's compensation was reasonable in comparison to other similarly situated businesses through Igor Ostrovsky, a valuation engineer with the IRS and a Accredited Valuation Analyst.

34.  Mr. Ostrovsky based his opinions on a national survey of financial rations published by Risk Management Associates ("RMA").  He used the date in the RDA for accounting firms with assets less than $1,000,000.

35. The RDA compares an officer's salary to the firm's profitability, and does not compare the salary of other officers.  Therefore, in determining the reasonableness of his compensation, Dahl's raw salary was not compared to the raw salaries of accounting executives in New York, Chicago, or Los Angeles.

36.  In 1997, JDA had an after-tax profit of 43% of its net sales.  In 1998, the profit equaled 38% of net sales.  In 1999, this amount was 37%.  Accounting firms in the RMA averaged profit before tax of 14.1% for 1997, 11.3% for 1998, and 7.7% for 1999.

37.  JDA was thus significantly more profitable than other accounting firms during this time

period, being 208% more profitable than its peers in 1997, 233% more in 1998, and 374% more in 1999.

38.  Dahl's salary as a percentage of net sales was 10% for 1997, 13% for 1998, and 13% for 1999.  The RMA average officer compensation as determined from the upper quartile, by contrast, was 18.1% in 1997, a 266% greater amount than Dahl's salary in relative terms.  In 1998, the average officer compensation was 25.7% and in 1999 it was 33.8%, both of which represent a 166% greater amount than Dahl's compensation in relative terms.

39.  When JDA's officer compensation is normalized by applying the same percentage as the average upper quartile in the RMA, his salary becomes $69,584 for 1997, $79,823 for 1998, and $79,711 for 1999.

40. Mr. Ostrovsky used two other sources besides the RMA, Leo Troy's Almanac of Financial Ratios as well as data from Job Service of North Dakota.  Both of these sources, however, would have produced a larger net income for Dahl than the RMA.

### Deferred Compensation Agreement

41.  In November of 1996, Dahl became involved with his family's farming operation.  Dahl began providing services for the farm at the request of his father to order to ensure the farm stayed withing the Dahl family.

42.  In 1997, Dahl's father announced his intention to retire from farming.  In response, Dahl formed Dahl Farming, Inc. in order to operate his father's farm.  Dahl's role in Dahl Farming was primarily administrative and bookkeeping functions.  Dahl performed these services as an employee of JDA, and billed Dahl Farming for the services.

43.  At the time Dahl performed the above services for Dahl Farming on behalf of JDA, the farm entity did not have much capital, having used all of its available capital and credit for

6

operations.  Dahl, as bookkeeper to Dahl Farming, Inc. was aware of such.

44. Dahl stated that the farm performed poorly financially during the winters of 1997 and 1998.

45.  Because Dahl Farming could not immediately pay its bills to JDA, and quite possibly may never had been able to pay its bills, JDA and Dahl Farming entered into a deferred compensation agreement wherein Dahl would receive 40% of any amount that Dahl Farming eventually paid to JDA.

46.  The compensation agreement was structured so that Dahl had no right to payments made by Dahl Farming until they were received.  Further, he would lose his rights to such payments if he ever left JDA.

47.  Dahl did not include the deferred compensation on his Forms W-2 filed with the IRS until he received actual payment of the deferred compensation.  Dahl thus assigned no value to the amounts "earned" in those years until he actually received payment.

## CONCLUSIONS OF LAW

### Burden of Proof

1.  The Plaintiff bears the burden of demonstrating that the IRS assessments were incorrect and also what the correct assessments should be.  See, e.g., IA 80 Group, Inc. v. United States, 347 F.3d 1067, 1071 (8th Cir. 2003) (citing United States v. Pfister, 205 F.2d 538, 542 (8th Cir. 1953)).  Plaintiff also bears the burden in demonstrating that the compensation paid was reasonable.  RTS Investment Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989)

2.  The United States has defended the suit using a different methodology than it used in its initial assessment of tax liability.  The government is free to use divergent methodology if it

supports the original assessment. Even erroneous assessments will be upheld if valid under a different theory.  Blansett v. United States, 283 F.2d 474, 478 (8th Cir. 1960).

3.  The United States' use of a different methodology than it used in its original assessment does not shift the burden from the Defendant to the United States.  Blansett, 283 F.2d at 478; King v. United States, 641 F.2d 253, 258-59 (5th Cir. 1981); See generally Spangler v. Commissioner, 278 F.2d 665 (4th Cir. 1960); Sidney v. Commissioner, 273 F.2d 928 (2d Cir. 1960).

**Reasonableness of Compensation**

4.  The Eighth Circuit, has set forth several factors for the Court to consider in determining the reasonableness of compensation with no single factor being dispositive.

5.  The reasonableness test encompasses nine factors, some of which may be inapplicable or unsuitable given the particular context of the case.  These factors are (1) employee qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexity of the business; (4) prevailing general economic conditions; (5) the employee's compensation as a percentage of gross and net income; (6) the employee-shareholder's compensation compared with distributions to shareholders; (7) the employee-shareholder's compensation compared with that paid to non-shareholder-employees or paid in prior years; (8) prevailing rates of compensation for comparable positions in comparable concerns; and (9) comparison of compensation paid to a particular shareholder-employee in previous years where the corporation where the corporation has a limited number of officers.  Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 182 (8th Cir. 1974).

6.  No evidence was introduced by either party as to the prevailing economic conditions during the years 1997 through 1999, rendering an accurate appraisal of the fourth factor difficult.

7.  The above test is adequately reflected in Trucks, Inc. v. United States, 588 F. Supp 638

(D. Neb. 1984).  There, the court utilized the above factors, grouping them into three broader categories for ease in analysis and discussion.  These categories were  (1) performance of the employee, (2) salary comparisons, and (3) company conditions.  This Court shall proceed in the same manner.  It is worthy to note that the facts relevant to each particular category do not exist in isolation, but are intertwined, and often complementary.

8.  In examining the first category, this Court concludes that Dahl's performance as head of JDA was exemplary.  His firm boasted profits far in excess of the profits generated by comparable accounting firms.  A reasonable director or chief executive officer who was hired and retained pursuant to arms length negotiation would expect to be compensated to a degree that matched his or her performance.  Here, Dahl's compensation is not congruent to his performance.

9.  A comparison of salaries also reveals that Dahl's salary was unreasonable.  Dahl was compensated slightly above of that of his employees.  Further, he received no raise from 1998 to 1999 despite his firm's success and despite the fact that all other employees saw a pay increase over the previous year.  This factor weighs against a finding of reasonableness.

10.  The conditions of the company would dictate greater pay to its chief executive. Certainly, JDA was a small enterprise.  The company required little in terms of reinvestment.  These facts contribute to generally low overhead which would, in turn, free up capital for employee compensation.  Further, the firm saw continuous growth in every subsequent year.  Certainly, the profitability of the firm would allow for a salary higher than that which Dahl received.

11.  In applying the Eighth Circuit's multi factored test for reasonableness of compensation, broadly grouped into the three categories articulated by the court in Trucks, the compensation paid to Dahl was not reasonable.

**Reasonableness of IRS' Assessment and Methodology**

12.  The figures $69,584 for 1997, $79,823 for 1998, and $79,711 for 1999, which are the amounts assessed by the IRS, are reasonable salaries for the years 1997 to 1999, respectively. These figures are larger than those on which the assessments in the counterclaim are based. Therefore, the figures in the counterclaim, on which the assessments are based, are likewise reasonable.

13.  The upper quartile of the RMA is the appropriate comparison as Dahl would be expected to command a relatively higher compensation given JDA's extremely high profitability under his direction.

14.  The Fargo Wage and Benefit Survey of the Job Service of North Dakota ("Survey") is not as accurate as the RMA as the Survey does not contain data as to average compensation for officers in accounting firms.  Instead, the Survey only contains data for accountants and chief executive officers as separate and distinct entries.

**Deferred Compensation Agreement**

15.  Income paid to Dahl from Dahl Farming via the deferred compensation agreement does not bring Dahl's salary to reasonable levels for the 1997 through 1999 period.

16.  The Court must analyze the reasonableness of Dahl's salary through factors "existing at the date where the contract for services was made, not those existing at the date when the contract is questioned."  Schneider v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974); Treas. Reg. § 1.162-7(a).

17.  Dahl did not include the deferred compensation on his Forms W-2 filed with the IRS until he received actual payment of the deferred compensation, therefore Dahl did not assign value to the amounts "earned" in those years at the time his services were rendered.

10

18.  The accounting services rendered to Dahl farming pursuant to the deferred compensation agreement were too speculative be considered the product of arms length negotiation. There existed no definite payment date, and the questionable vitality of Dahl Farming made nonpayment a very real possibility.  Moreover, Dahl had no absolute right to the payments, as he would lose them if he terminated his employment with JDA before such payments were received.

19.  Given the risk and lack of timeliness inherent in the deferred compensation agreement, a reasonable employee would not accept such an arrangement governing the lion's share of his or her salary.

### Ultimate Conclusions of Law

1.  Plaintiff's claim for $2,861.44 is without merit.

2.  The Court finds that Defendant's counterclaim for additional tax assessments in the amount of $22,385.92 is valid.

**IT IS HEREBY ORDERED:**

1.  Judgment entered against Plaintiff in the amount of $22,385.92

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 19th day of May, 2006.

Ralph R. Erickson, District Judge
United States District Court